The Judges delivered their opinions.*
Judge Carr.
In 1806, the appellee filed his bill against the appellant, stating that the plaintiff was the assignee of a tract of land derived from one Razor: that the defendant was owner of a tract derived from Madison fy Co., being part of the preemption right attached toasettlement called “The Pasture:” that Razor’s was the eldest entry and survey; but that the defendant has the eldest patent. The bill then goes on to detail the faets and circumstances which give him, in equity, the better title; and prays that the defendant may be decreed to convey to him the legal title.
This brief statement shews, that in its origin, this case presented the naked point so often decided in this Court, and at length so solemnly in Noland v. Cromwell, 4 Munf. 155; whether equity could interpose to set up the younger against the elder patent, where no caveat had been taken out, and no reason for the omission was stated in the bill. Noland v. Cromwell, was decided in 1814.
In 1819, the plaintiff had leave to amend his bill. The object of this amendment was to furnish ground of excuse to the plaintiff for having failed to resort to the caveat. The ground is this: that on the 10th of February, 1789, Newell, a deputy surveyor, surveyed the land claimed by the plaintiff: that on the 6th of June of the same year, the same surveyor made, for those under whom the defendant claims, the surveys which conflict with the plaintiff’s; and he expressly charges that the lines of these last surveys, so far as they interfere with the plaintiff’s, were never actually run, but protracted from the survey made for Razor; and he refers to the connected survey, to illustrate the fact. This, he believes, was done with fraudulent intent, in order to keep the said Razor in utter ignorance that there *511 was any interference; and the fraud, he avers, succeeded, as the said Razor, an ignorant man, residing upwards of fifty miles from the surveyor’s office, never discovered any such interference; nor had the plaintiff the least knowledge of it, until the patent had issued. Hence it was impossible that a caveat eould have been entered; This is the ground of excuse.
Before I test its sufficiency by the standard of Noland v. Cromwell, it. will be proper to ascertain what is the authority, at this day, of Noland v. Cromwell itself. The Court have said, that this case shall be taken as a cor - rect exposition of the law, at the date of the decision; but, that the effect of subsequent statutes on it, is open to argu incut. Accordingly, it has been contended, that the act of 1814, giving the scire facias to repeal patents, and the declaration in the revision of 1819, that the failure to caveat shall not affect the legd or equitable rights of the party, have prostrated Noland v. Cromwell, proclaiming in language not to be mistaken, the legislative will and understanding on the subject.
Noland v. Cromwell, pronounced the law to be, “that though a party may be let into equity, on grounds which he could not have used on the trial of the caveat, or upon a case suggesting and proving that he was prevented by fraud or accident from prosecuting his caveat; he is not to be.sustained in the Court of Equity, on such grounds as were or might have been brought forward on the trial oí the caveat.” The Legislature certainly have not undertaken to declare, that this is a misconstruction of the lew. They have understood better the line which separates their powers from those of the Judiciary. Bui what have they done? In 1814, they passed a law “declaring and regulating the practice of siting out and prosecuting writs of scire facias to repeal letters patent.” Any person wishing to prosecute a scire facias, to repeal letters patent for lands, fee. either because they had been obtained by false sugges tions, had issued contrary to h\w¡, or to the prejudice of hi' *512 private rights, shall apply by petition to the Court or Judge, who shall direct the clerk to issue a writ to the Register, commanding him to certify the grant, &c. On the return °f this writ, the grant is to be recorded, the scire facias issues, and the case proceeds according to the directions of the act, which are very special. Now, surely, it need hardly be observed, that this act can apply only to cases brought under it: that it can have no influence on a bill addressed to the general jurisdiction of equity, even since its passage; much less, on a bill filed long before, and depending in Court when it became a law.
In the revision of 1819, the law, after repeating what former statutes had enacted on the subject of caveats, has these words: “ The omission, however, of any person claiming such better right to avail himself of the remedy by caveat., hereby given, shall in no wise be construed to bar or hinder such person, from asserting such better right in law or equity, in the same manner as if no such remedy by caveat had been given him.” The whole frame and structure of this sentence shew, that it is prospective entirely. It is one of a large class of cases, in which the judicial decisions point out to the Legislature what they consider an evil, and they apply the remedy. But, the remedy always looks forward. The Legislature do not mean to say to the Judges, “You must decide thus and thus, in cases now depending before you.” This would be usurpation. This act, then, while it acknowledged the rule established by Noland v. Cromwell to be, at that time, the existing law, did not intend to affect its operation in past or depending cases, but merely to provide for the future; and if any thing further were necessary to prove this, the saving at the end of the act, is conclusive to that purpose. Noland v. Cromwell, then, gives the law to the case before us; and we must examine whether under this law, the plaintiff has suggested and proved, a sufficient excuse for failing to caveat. The excuse is, that instead of an actual survey by running over the ground, the notoriety of which *513 would have put the opposite party on his guard, the surveyor merely protracted the lines of the last surveys from the courses and distances of the survey made for Razor. I will not consider what weight this allegation would deserve, if proved; because, to my mind, it is wholly disproved by the answer, which denies it; by the plat, which shews that the lines in the first and second surveys are not the same; and by Newell, the surveyor, who swears that he actually ran every line in the last surveys but the closing line, which is always protracted. The plaintiff states that Razor lived more than fifty miles from the surveyor’s office, and that both he and the plaintiff were entirely igno» rant of the interference, until the defendant’s patent had issued; and this ignorance the Chancellor considered as giving him clear jurisdiction of the cause. But surely, this was in the very teeth of Noland v. Cromwell. It is there said, that the caveat law meant to prevent and cut up the numberless doubts and disputes, as to notice or no notice, and to establish a general criterion: that the notice principally established by the act, is the entry in the surveyor’s book, which is open and accessible, to all: that the entry, when followed up by a survey, which the law also provides, shall be made shortly after, affords complete notice of the claim thereby set up, and operates as an invitation to persons having prior pretensions, to bring them forward by way of caveat. Of this survey, (the Court add) it is not competent to adjacent adventurers, to aver an ignorance.
if it be said, that there was fraud in making the surveys of the defendant, 1 answer, 1st, that the only fraud suggested is the protracting, instead of surveying, the last surveys, which is disproved; 2d, that the existence of fraud will not take the case out of Noland v. Cromioell, unless it be also suggested and proved that the party was prevented from prosecuting a caveat; or, that upon the trial of such caveat, he could not have brought forward the fraud.
*514 The whole ground, then, taken by the amended bill, to excuse the failure to caveat, is taken away; and under the authority of Noland v. Cromwell, I must hold that the decree be reversed, and the bill dismissed.
Judge Geeen.
In the case of Hughes v. M'Clung,* I stated the reasons of my opinion, that after a grant issued, any one claiming a prior equity against the grantee, can in no case have relief in equity, unless upon the ground of actual fraud in the acquisition of the legal title, or unless the party was prevented from prosecuting hiscaweai, by fraud, accident or mistake.
In this case, the plaintiff alleges, that Razor, under whom he claims, was prevented from filing his caveat, by reason of a fraud in the surveyor, and the party under whom the defendant claimed, in returning a survey not actually made upon the ground, but made out by protraction; and that Paul Razor, being an ignorant man and residing more than fifty miles from the surveyor’s office, did not discover the interference of this survey with his, until after the patent issued upon it. The suggestion of fraud in protracting the survey, for the purpose of keeping Razor in ignorance of the fact of the interference, is disproved by the surveyor, who testifies that he actually surveyed all the lines, except the closing line, and they were marked. The allegations as to Razor’s ignorance and residence, are neither confessed nor denied by the answer, and are not proved. Both these facts were capable of proof; and if they were of any consequence in the cause, cannot be taken to be true, without proofs. Razor’s entry was made on the 11th of November, 1782; his survey, on the 10th of February, 1783; and the other survey was made on the 6th of June, 1783. His entry describes the land located, as *515 that upon which he resided; and both surveys being made early in the year succeeding Razor’s location, and within four months of each other, there is the strongest reason to believe, that he resided on the land in controversy when the survey under which the defendant claims was made, and had actual notice thereof. The plaintiff, therefore, is entitled to no relief, unless the legal title, under which the defendant claims, was tainted with actual fraud.
The surveyor, who made the survey of the 6th of June, 1783, (under which the defendant claims) and the persons entitled to that survey, had actual notice of Razor’s prior entry and survey; and if the party entitled to the warrant under which that survey was made, had no just and equitable right to appropriate the land, notwithstanding the prior entry and survey, his doing so with full notice, was an actual fraud.
The plaintiff claims under a treasury warrant; the defendant, under a settlement and pre-emption warrant. Razor’s entry and survey were made before the pre-emption warrant issued, and before the settlement right was surveyed. But, the. existence of the settlement right was known; for, Razor’s entry calls for it as the Pasture Settlement.
At the time of Razor’s entry and survey, the state of things, in respect to the lands in the neighbourhood, was this: On the south side of New river, was a tract of land already surveyed, called Burga man’s .Bottom; a corner of which is called for in Sayers’ subsequent survey, under his pre-emption warrant made June 6, 1783, under an entry of December 10, 1782. Far below, in a deep northern bend of the river, Robert Sayers had a settlement right, surveyed the 31st of January, 1782, as the record is; probably in 17S3. The intermediate land on the river was entered for by Sayers, under a pre-emption warrant, on the 10th of December, 1782. This entry surrounded Sayers’ settlement survey, on throe sides, (the river being on the other side;) and, besides taking all the land between his settlement and the tract called Burgaman’s Bottom, eiitei; *516 dec! down the l'iver, to the settlement called the Pasture. This settlement, and the pre-emption thus located and surveyed, were called the Lead Mine tract. Next below this tract on the river, lay the Pasture Settlement. Next below the Pasture, and at the point where the river takes a great southern and southeastern turn, lay Samuel Ewing’s settlement already surveyed; beginning on the river at the lower corner (or rather, what was afterwards the lower corner of the Pasture Settlement) and running southeasterly to the river, a great distance below, including the whole tract by one line and the river. This line ran nearly parallel with the lower line of the Lead Mine tract, leaving for the Pasture Settlement, between these two lines, only a space about 350 poles wide.
In this state of things, Razor located his treasury warrant, calling for both the Pasture Settlement and Ewing’s line, and surveyed before the Pasture Settlement was surveyed; and if he had surveyed according to his entry, there would not have been one inch of land unappropriated, adjoining the Pasture Settlement, upon which the pre-emption warrant, attached to the Pasture Settlement, could be located; for, it could only be located on lands adjoining the settlement. The Pasture Settlement was bounded by S. Ewing’s settlement on the west, by the river on the north, by Sayers’ pre-emption on the east, and by Razor’s entry on the south. The pre-emption warrant was not issued when Razor entered and surveyed; but, his entry was liable to yield to the pre-emption, if the warrant should issue at any time within the period allowed by law, and which was from time to time enlarged, until long after the period when these transactions took place. The pre-emption warrant was issued on the 18th of February, 1783; and the holder had a right to locate it upon the land entered and surveyed by Razor, under a treasury warrant, even if all the other adjoining land had been unappro- ■ priated.
*517 The owners of the pre-emption warrant, however, loeated their warrant on the 30th of April, 1783, to adjoin the Pasture Settlement, and the land called Burgaman’s Bottom. They intended to take the very land covered by Sayers’ pre-emption warrant already surveyed. Without taking this, the survey could not be made in the proportions prescribed by law. For although, in consequence of Razor’s survey not being made according to his entry, there was a narrow space left between his survey, and that afterwards made of the Pasture Settlement, through which opening the pre-emption warrant might have been surveyed, so as to run from the south side of the Pasture to Burgaman’s Bottom land in the rear of Sayers’ survey, and in a long narrow slip, probably ten times as long as it was wide; the locator certainly did not intend to lay off the land in this way. It would have been contrary to law, and the land of no value to him. The locator of the preemption warrant, either was ignorant that this land was previously occupied by Sayers’ pre-emption survey, or intended to contest with him the right to pre emption in this very land. Probably, this latter was the fact; for, on the 6th of June, 1783, the parties met, and Sayer exchanged his settlement and pre-emption for the Pasture Settlement and pre-emption; and it was agreed, that the lands should be surveyed according to the lines then agreed on. The balance, and more than the quantity of the balance of Sayers’ pre-emption, was thereupon surveyed under hie entry of December IGth, 1783, adjoining the Burgaman’s Bottom laud and the Lead Mine tract; and the Pasture Settlement was surveyed, and the pre-emption belonging ie it, to the amount of 858 acres, was surveyed in three surveys; including the whole of Razor’s survey, except about 66 acres, which have been since located under the same pre-emption warrant, but is not patented.
I have already said, that notwithstanding Razor’s entry and survey, the pre-emption warrant might have been located upon the same laud, in first instance: and the *518 question is, whether the right to locate it on that land was forever lost, by locating it elsewhere. I think not; especially as to one locating before the issuing and entry of the' pre-emption warrant; however, it might be as to one induced to locate the adjoining land, by the fact of the party entitled to the pre-emption making his electiorrby entry of-other land. I incline to think, that as the owner of a treasury warrant might withdraw his entry and locate it elsewhere, the owner of a pre-emption warrant might shift his entry from one piece of land to another, falling within the terms of his entry, at any time during the period allowed by law for entering the pre-emption warrant, however this may be, when the first entry is upon land, to which no other has a better right. If the first entry is upon land to which another has a better right, and the entry could not be withdrawn and re-entered, the party would lose the benefit of his pre-emption; and in that case, he has, I think, a clear right to transfer his entry, having, by mistake, entered land, which he could not acquire; and this, particularly, against a locator under a treasury warrant, entering before the pre-emption warrant was issued.
Sayers’ warrant, entry and survey, all preceding the issuing of the Pasture pre-emption warrant, the presumption is, that his right to the land first entered, under the Pasture pre-emption, was the best; and after a lapse of upwards of twenty years, arising from the laches of Razor and the plaintiff, this presumption cannot be overruled upon surmises not amounting to proofs, that the contrary was the fact. The owner of the Pasture pre-emption warrant might have withdrawn his original entry, and entered it upon the land, which was actually surveyed under it; in which case, his preferable right would have been unquestionable. The only difference in justice, between a survey of this land, with or without such a previous entry, is, that an entry would serve to give notice to Razor, so that he might, as it is said, withdraw his entry, and locate the warrant elsewhere. But this he could not have done. The *519 warrant was merged in the survey; and it was his own foiiy to proceed so far as to survey, with the possibility of a pre-emption right displacing him. Taylor v. Myers, 7 Wheat. 24.
But, if such notice could have benefited Razor in any way, I am satisfied he had it in fact He lived upon the land when it was surveyed, and no doubt was satisfied, that the other party had, in substance, a right to take the land, ■whether ho proceeded strictly in conformity with the forms prescribed by law, or not, and acquiesced until after the patents issued in 1788, and then sold to the plaintiff; who, .1 have no doubt, purchased a chance, as the answer alleges, for a trifle, and was one of those hunting up stale claims to disturb the titles of others. He himself did not pursue his claim so acquired, until upwards of twenty-three years after the survey, when the parol evidence, which might have a decisive influence upon the equities of the parties. Is probably lost.
I do not think that there was any actual fraud, which could affect the conscience of the party, and deprive him of his legal advantage. The decree must he reversed, and the bill dismissed with costs.
Judge Coaitek.
How far the ease of Noland v. Cromwell, will operate on this case, seems to me to depend very much on several matters of fact, arising on the consideration of the merits of the cause; and I shall therefore proceed, first, to examino them as if they were open to examination, notwithstanding that case.
The first, and a very important enquiry is, what lands were covered, or intended to be covered, by the following entry; for, it is under that entry, that the lands in dispute have been surveyed and granted to the appellant, or those he claims under.
*520 li 1788, April 30th, Thomas Madison <$• Co., by vir^ue a Pre-empt>0Q warrant of 1000 acres, No. 2373, dated 18th of February, 1783, enters the same adjoining his settlement called the Pasture, and the lands called Burgaman’s Bottom. ”
Although Thomas Madison 8? Co. are not called the Lead Mine Company in this entry, they are so denominated in the survey of their settlement right, and in the surveys made under this entry. They were a company, who had it in view to procure, and probably to work, a Lead mine, which it was supposed lay in that tract of country, between the Pasture Settlement and Burgaman’s Bottom. One of the surveys, to wit, that made for Robert Sayers for 794 acres, (hereafter mentioned) calls for the head of Lead Mine branch, in the direction aforesaid; and the contract made between the company and Sayers (hereafter also mentioned) describes this tract of country as the Lead Mine hills. The Lead Mine tract of land, then, was doubtless the object of the Lead Mine Company.
But, one Robert Sayers had procured certificates of settlement and pre-emption, by which he had covered a considerable portion of this territory, before the entry in question was made. It appears by the certificate of survey of his settlement right, made on the 8th of November, 1782, that his certificate of settlement was obtained on the 13th of September, 1782; but, whether that of the company, for their settlement, was obtained before or after this, does not clearly appear; nor which was the earliest settlement, does not appear in this record. This settlement right, however, was surveyed by Sayers in November, 1782, six months or more before the entry of the company aforesaid.
Robert Sayers also, on the 28th of January, 1783, by virtue of a pre-emption warrant of 1000 acres, dated the 10th of December, 1782, No. 2356, enters the same joining his entry and survey on his settlement, on the east side of New river. As well this entry as the warrant, it is true, are dated before the date of the pre-emption warrant *521 of the company, and even the survey for 794 acres, made fay virtue thereof, is anterior both to the date of the warrant, and the entry thereon by the company. Yet nevertheless, it may have been, and probably was, the intention of the Lead Mine Company, to claim the Lead Mines against Sayers’ pre-emption claim at least, if not his settlement, either by contesting his settlement right, or by showing their settlement to be the oldest, and to carry with it priority of pre-emption right; or, they may have intended to dispute the matter on the ground that Sayers’ location of his pre-emption warrant was too vague, inasmuch as it does not state on what side of the settlement survey it was to join, and left the matter as open in that respect, as the warrant itself, so as to join on any part of the settlement survey he might thereafter select; or finally, which is not very probable, they may have been ignorant of Sayers’ claim, and made their location, so as to cover the Lead Mines, believing that tract to be vacant.
Z3ut, supposing them to be well acquainted with Sayers’ claim, and that it was the best, they may still have made their entry or location in the direction of Burgaman’s Bottom, with a view of covering some four or five hundred acres of the Lead Mine hills then vacant, and not included in Sayers’ pre-emption survey,
Z have endeavoured, therefore, to discover where the settlement and pre-emption surveys of Sayers, above referred to, lie in the Lead Mine survey, as laid down in the connected plat in the cause; and by comparing the various surveys, and notorious and common corners together,
I have discovered that Sayers’ settlement survey begins on or near the river, about as far above little, a, as the length of the line a, b; to wit, 100 poles; that it runs around, and again comes to the river, at a point about 250 poles below the letters J. H; and then down the river, to the beginning. I find also, that the pre-emption survey of 794 acres aforesaid, begins on the river, where the settlement survey calls to strike it, and reversing the, coin’s® *522 of that survey, runs back with it, to or near the river; thence 100 poles to the point a; thence to a hickory cor» ner at c, on the west side of Burgaman’s branch; thence two courses up that branch, in all 114 poles. It then leaves the branch, and finally arrives at the point m; which is a notorious one in several of the surveys; and so goes round to the river, and down it as aforesaid; leaving out vacant land towards Burgaman’s tract, to the amount say of 470 acres, afterwards surveyed by virtue of Sayers’ pre-emption warrant, as will be hereafter more particularly noticed. Thus the company may at least have had this minor object, or this portion of the mine tract, in view, if not the whole. Or, there may have been, and probably was, other vacant land lying in that direction, and which was afterwards covered by the survey of 573 acres; of which particular notice will be taken hereafter. But I incline to think, that they had the whole mine hills in view, either through ignorance of Sayers’ claim, or intending to contest it. For, if they knew of it, and intended to submit to it, nothing would have been more natural than to have called for it, as well as Burgaman’s Bottom, in making their location. The 470 acres of Lead Mine hills, were surely no small object to the Lead Mine Company. Suffice it to say, that from all these reasons, I am well satisfied that the calls of their location, not only cover the lands lying in a direction almost opposite to those now in controversy, but that that land was the real object of the company; and that it would be very natural for every other adventurer to suppose, that the Lead Mine Company would wish to acquire the Lead Mine tract, or as much of it as they could, must be apparent to every one.
Their location, then, of their pre-emption warrant, did not cover the land in controversy, but lay entirely in an opposite direction.
How then did these parties stand at this period of time ?
Robert Sayers, On the 13th of September, 1782, had obtained from the commissioners a certificate for 400 acres, *523 an the S. E. side of New river, including J. Cast till’s improvement; and on the 8th of November, 1782, he oh-tamed a pre-emption warrant for ] 000 acres on the S. li side of New river, and adjoining his survey on his settlement. This he enters, as aforesaid, giving no further notice of the manner he intended to survey, than his war* rant prescribed. But shortly afterwards, to wit, on the 31st of January, 1783, he proceeded to survey 792 acres thereof, binding all round on the settlement survey, as is above stated, leaving 208 acres unsurveyed of that warrant, and leaving also, other vacant land in the direction of Burgamcm’s Bottom, to the amount, in all, of 470 acres. At this time Sayers lived on what was called the Pasture tract, a considerable distance above his settlement right above mentioned.
On the 11th of November, Paul Razor, by a Slate warrant, enters 500 acres on the south side of New river, opposite the upper end of Samuel Muring’s land, to join his patent line, and the place Sayers lives on, called the Pasture, to include the improvement said Razor lives on, and those made by William Burke and Samuel Byrd; and he proceeds, on the 10th of February, 1783, to survey 274 acres of this entry. This is the land in dispute.
So far it seems, that this entry did not conflict with Sayers’ claim on his settlement and pre-emption; nor did it interfere with the Pasture tract, or any settlement right that then was obtained, or might thereafter be obtained for it. Razor was a settler in the country, had purchased his warrant, and promptly surveyed his lands; his settlement, I presume, not being of a date old enough to entitle him to a settlement right from the commissioners. But it was surely enough to shew, that he was no speculator, but equitably entitled to the land, unless against those having superior equity. This could only be in relation to any pre-emption right, which might attach to the Pasture settlement. It would probably have to give place to that,, but to nothing else.
*524 I am not entirely satisfied, that a pre-emption warrant will over-reach an entry made by a common treasury w.arrant, made before such certificate of pre emption was obtained. The original act of May, 1779, chap. 12, sec. 5, directed the pre-emption warrants to be entered within twelve months, or the right of pre-emption would be forfeited; and the act of the same session chap. 13, sec. 3, provides, in order to prevent interferences, that no entry or location by a treasury warrant shall be made before the 1st of May then next following. See also what is said by this Court in the case of Jones v. Williams, &c. 1 Wash. 231, and in 2 Wash. 47.
But, it is not necessary to settle this question in this case; and I am not to be considered as deciding it, one way or the other. It may be too, that Razor had a settlement right made after 1778, which would have entitled him to a pre-emption of 400 acres; and which, as I understand the act, would have taken precedence of the pre-emption attached to the Pasture tract; but that he preferred taking it under a treasury warrant, to save the trouble of going before the commissioners.
Neither the certificate of settlement for the Pasture tract, nor that for the pre-emption thereto attached, is in the record; so that it does not appear when they were obtained. Most generally, I believe, they were obtained at the same lime; the one following as incident to the other, if demanded, as we may well presume it was in this case. For, the Lead Mine Company could only acquire any portion of the Lead Mine hills, by their pre-emption, as the Pasture Settlement did not extend to them. As to them, the pre-emption right was the main object. But the pre-emption warrant, as above described in the entry, was obtained on the 18th of February, 1783, and entered on the 30th of April following; and both of them, posterior to the entry and survey of Razor', and thereupon the party, with á full knowledge of Razor’s actual residence on his land, under his prior entry and survey, proceeds to locate his *525 pre-emption warrant, so as to call for lands not at all interfering with the land in dispute. If we confine our enquiry to this point of time, how would the parties stand ? Sup¡tose Razor had obtained his warrant; but believing his settlement must be taken, if the Lead Mine Company should elect to locate their pre-emption warrant in that direction, had waited to see what, they would do; and finding they had located on the other side, had then made his entry. Would it have been competent for the company, after having thus made their election, to change their location and make another on the other side, after finding that the lands they had located were either claimed by superior rights, or were of inferior quality ? It seems to me, that they could not. It was enough surely, to hold all the community in suspense as to what side of the settlement the pre-emption was to join, until the election was made; but that once made, it could not be necessary that the whole country should still stand in suspense, until a survey was made, in order to see whether the election would not be changed. If Razor had returned his plat, and it had been caveated on the ground that the company might change their election, and re-locate on that side, or until they might peradventure survey on that side, as they af? terwards did by virtue of this same entry, what would have been said to them as to this matter ?
The posterior laws, extending the time of making entries on pre-emption warrants, onty extended to cases where they had not been entered at all, and were not intended to enable the party who had made his election, to change it and make a new entry. These pre-emptions were not so highly favoured as that. The party was to pay for the land the same price as for a treasury warrant; was to locate promptly, or forfeit his right to pre-emption; but then he might use it as a treasury warrant, either to oover the same land, if not before entered for by another; and if that was done, then he might lake other lands elsewhere., js by any other warrant. May Session, 1770, *526 eh. 12. The short time thus limited for its original entrys and the other provisions in the act of 1779, Ibid. ch. 13, sec. 3, and subsequent acts, October, 1779, ch. 27, sec. 2; May, 1782, ch. 49, sec. 7; October, 1784; clearly shew, that such location once made, bound the party, so that he could not change it from time to time, as it might suit him to do so. Surely, if his failure to enter deprived~him of the privilege intended by the act, so as to let in other adventurers, his election to take it in a particular direction, would let them in on the residuum. Nor will Razor stand in a worse situation, than if he had not made his entry until after this election had been made. That election shews that the party did not choose to interfere with him, and was no notice to him to lift his warrant, and enter it elsewhere, but the reverse. Taking the case up then at this stage, and there can be no question as to whom the land in controversy then belonged.
It remains to see what followed afterwards, and whether it has varied these rights.
No survey had been made by the company at this time. A survey of their settlement right could not possibly interfere with Razor’s survey; and had they proceeded to survey their pre-emption right according to its location, there would have been no interference. It surely cannot be contended, that if the entry is discovered to be made on another’s land, that circumstance would justify surveying that entry wherever vacant land can be found, and entirely in an opposite direction, even without making a new entry; but in that case, the warrant only stands as other warrants, although he might originally have elected to take that land. Much less, would it authorise a survey of that other land, without any entry for it. All the cases, Johnson v. Brown, 3 Call, 259; Hunter v. Hall, 1 Call, 206, &c. prove, that the location must be pursued where it designates with certainty the lands intended to be covered; and also, that it must have reasonable certainty. Here, there is no doubt as to the land intended, which too, were then unpatented, *527 and for aught that appears, may have been subject to this location. For they may, and probably did, locate that identical land, as aforesaid, with a view of contesting Sayers’ survey, on the ground that their settlement was the oldest, and drew to it the oldest pre-emption. There were also 470 acres of vacant land in that direction, not surveyed by Sayers; and when there are two entries on the same land, and the first locator proceeds to survey, if he does not take all, then I presume, they had a right to survey what was left. For, there is no case in this Court, going to say, that the second locator is not entitled to the residue, in such case; bat, the reverse seems to be pretty strongly indicated. Currie v. Martin, 3 Call, 28, 36; Johnson v. Brown, Ibid. 260, 268. The policy of the law was to have the lands granted, so as to derive revenue. It may be, if the first locator supposes that he has gotten his quantity, and if on calculation, (which can generally be made in an hour by the surveyor,) he finds that he has not, he might open his lines, and take in more land, before closing the survey, as he may wish to have his land in several tracts. But it must be, I conceive, one eon-tinned act of surveying; otherwise, it will be considered an abandonment. If he can suspend, without abandoning, for months, he can for years, and as long as the Legislature continues the time to survey; and thus keep the second locator out, even so as perhaps to forfeit his entry. The laws giving further time to survey, were never intended to produce this effect. No further time was necessary, to one who has made his survey. The act only oro vides too, that warrants may be carried into effect by one or more surveys, and may be exchanged, &.C., not that entries are to lie open in this way. If the party does not survey all the land he enters by his warrant, he may get an exchange warrant, and locate elsewhere. This the Jaw provides for.
This is my present impression of the law. If I am right <n this, it then appears that, exclusive of the Pasture^ or *528 Settlement tract, there was then even vacant land, answering to the calls of the entry, to the amount of 470 acres; and if, after surveying this, they had been allowed t° run in a different direction, and to take all the vacant land, so as not to interfere with that in dispute, there would have been, in addition to the above quantity, all that part of survey No. 3, and No. 4, which lies outside of the land in dispute, to the amount of at least 360 acres, and the whole of survey No. 5, of 340 acres; in all, 1070 acres.
But, instead of the Company proceeding to survey according to their entry, and contesting the matter with Sayers, or at farthest, proceeding to survey in the manner last mentioned, they enter into an agreement with Sayers, on the 6th of June, 1783, by which he gives up all his right, title and pretensions, he has or may have, to the Lead Mine hills, the 1000 acre survey, (what survey this is, does not appear in {he record,) and the Bottom, called Buchanan’s Bottom, (perhaps amisnomerof Burgaman’s Bottom,) to the Lead Mine Company, for and in consideration of a tract called the Pasture tract; which is given in exchange, according to lines and courses now agreed on by both parties, and to be surveyed. It would seem by this, that the Pasture tract, or settlement right, was alone given in exchange; but the fact was otherwise, as appears by a letter from Lynch, who negotiated this business, to Thomas Madison, another of the company, and their agent, dated 31st of July, 1795. What lines were agreed on, is not specified in the agreement; but the after acts of the parties shew, that Sayers was not to survey the pre-emption entry, according to its calls, on the Lead Mine hills towards Burgaman’s Bottom. His pretensions thereto, under his original rights, were abandoned and transferred; and he was to survey the company claim, according to lines then agreed on. This part of the agreement shews that a conflict between these parties, as to the Lead Mine hills, liad before been contemplated, which *529 was thus put an end to. The parties then proceeded thus. Instead of assigning the entries and surveys, as they then stood, they used each other’s names in making the sur* veys, and those surveys were afterwards assigned; and those surveys are all made, or rather purported to be made, {for the fact could not be so) on the same sixth of June, 1783. When they were in reality made, and which was made first, does not appear. A survey is recorded as of that date for Robert Sayers, though in fact for the company, by virtue of his pre emption warrant, for 470 acres, although this same survejmr, James Nowell, had shortly before surveyed 794 acres, by virtue of this same warrant; thus giving to the company 264 acres surplus, and for which there was no warrant; and which is within ten acres of as much as the land now in controversy. So that if, instead of this fraud on the public, as well as on this individual, they had even left that much of the Mine hills to be covered by their’entry, now belonging to Sayers, this controversy need not have taken place. Sayers, on his part, under this agreement, though in the name of the company, proceeds to have the Pasture survey of 322 acres made, No. 1. He also proceeds to have made, or recorded rather, as of that date, the following surveys, by virtue of their pre-emption warrant, to wit; survey No. 2, of 214 acres; No. 9, oí 338 acres; and No. 5, of 240 acres; in all 7.92 acres. And afterwards, to wit, on the 18th of October, 1789, another of 66 acres, No. 3; in all, 858 acres; No. 2 and No. 4, interfering with the laud in dispute, and No. 3, taking the residue of it.
It is charged in the bill, that there was also a survey made by virtue of this same pre-emption warrant, on the 12th of June, 1783, for 573 acres. This, added to the 792 acres, (the amount of the three surveys above mentioned, and purporting to be made on the 6th of June,) would make 1365 acres; or 363 acres more than the warrant. And if the 66 acres are added, it will make 431 acres more.
*530 On this subject, the answer says, “that the respondent ^as heal’d an<i believes, that a survey made for the Lead Mine Company, of 573 acres, was found on the records of the surveyor, dated the 12th of June, 1783¡purporting to be made by the same pre-emption warrant as the sur-' veys before described, (to wit, those above mentioned, including that of 66 acres;) but that it' was an error, which was rectified by returning that survey, by virtue of another warrant; and he insists, that no act done by the Lead' Mine Company, on the 12th of June, could affect the surveys made on the 6th. For, on the 6th of June, the company exchanged the said pre-emption warrant, and the settlement also, with Sayers. Now, it is apparent, that all these surveys were made after the 6th; though this con venient surveyor makes them all bear that date. For, the very agreement of transfer and exchange says, the surveys were to be made according to lines then agreed on; that is, I presume, division lines, so as to save the Lead Mine hills to the company. All these surveys, then, though in the name of the company, were, in fact, after-wards made for Sayers; this one of 573 acres being one of them.
Mark these transactions. The Pasture land, and the pre-emption attached to it, were no object to the Lead Mine Company, unless they could, by the latter, get the Lead Mine hills. But to Sayers, who went for agricultural and pasture lands, and who lived on, and was doubtless attached to, the Pasture tract, the Lead Mine hills were of no value, except as an object of speculation. He would easily be persuaded to give them up, and get other lands, such as he wanted; and thus the Ideation was to be changed.
Bat, it was a mistake. What mistake ? If, by including more than the warrant, it seems to be one familiar with that surveyor. But it may be, that, the first surveys were intended to exclude the lands in dispute, and ran round them;; but, that it was afterwards concluded on to take *531 diese lands, and to secure the 578 acres otherwise. But, where does this tract of 573 acres of land lie ? We know not: but very probably, more within the hounds of the location, than the land in dispute,
But, that survey stands on the records, as made by this warrant. How then could it bo returned as made by another ? It. is true, this surveyor had the physical power to do so, much more than he had to make all these .surveys on the after-part of the day, on which this contract was made. But, has he even done so ? And who persuaded him to commit that crime of-falsifying a record, or giving an untrue copy of it ? Not the Lead Mine Company; for, the warrant did not then belong to them. But, where is .the proof, that, this survey has not been carried into grant, on this very pre emption warrant? It is charged in the bill, that a grant has issued on it; and that seems admitted in the answer. But there is no proof, that it was by another warrant. It also charges, that Sayers sold the whole of the surveys to Jackson.
Badly as this surveyor appears in this case, we cannot Impute to him such a fraud and crime, as returning an untrue record; and if we could, who had a right to control him in that business, but Sayers, for whom that survey must, have been made, or those claiming under him ?
In this view, then, this warrant has been more than filled up without the 214 acres in controversy, and we know not which of all these surveys was actually made first. Surely, if all this, or half of all this, had appeared on a caveat, there can be no doubt how it would have terminated. And the only question is, whether the case of Noland v. Cromwell, 4 Munf. 155, is to deprive this party of his most Just and equitable rights? If that case is to sanctify such proceedings, and to deprive a Court of Equity of their original jurisdiction to relieve against frauds of this description, wo ought to pause before we give it that effect. Al! the preceding, as well as subsequent cases, it seems to me, would be in opposition to it.
*532 The bill in this ease, it is true, does not say in express terms, that the party was ignorant, and therefore could not file a caveat. It was filed in 1806; and until the above case in 1814, this allegation was not deemed as important as it possibly may be now. But he says, that certificates of surveys had been made out, purporting that the lands had been surveyed; but, whether they were actually surveyed or not, he does not know; and on these certificates, purporting to be dated so and so, grants have issued, and amongst others, for the 573 acres, all by virtue of that warrant: that Razor, by his attorney in fact, transferred his survey to the plaintiff', who has obtained a juniorpatent, Sic. He, however, insists, first, that more lands are covered by the defendant’s patents, than his warrant justifies; and that the survey does not correspond with the entry; otherwise, it would not have touched the land in controversy.
As to there being more land covered, &c. the defendant, in his answer, after giving the account above mentioned of the 573 acres, says, even if that were not so, still the surveys, which cover the plaintiff’s lands, were made prior to that; and if any was void, it would be that for the 573 acres. But, it is no where pretended, that these 573 acres were not within the limits of the location, though where they lie, is not stated or laid down in the plat; and it may have been in reality the first survey, though purporting to be on the 12th; for it is apparent, that those said to be made on the 6th, were not made on that day. As to not surveying according to his entry, he says, that it was necessary to join the settlement right; and if he' could not do that, and join Burgaman’s Bottom also, that part of the entry will be rejected, and the entry not void. In other words, he may then run in an opposite direction. But he says, it is practicable to lay off the 1000 acres, so as to join the bottom, by running out the 142 acres, still left of the warrant, in a narrow slip, so as to touch it; which would be good, after a patent, &c. This last position is undoubt *533 edly true, if it is also true, that a patent covers and sanetifies every manner of fraud.
But it would look better, I think, to take it, as was done in this case, even without this finger reaching out, and as it were, pointing to the fraud. There was no objection in the answer to the jurisdiction of the Court, on the ground that a caveat had not been filed, as in the case of Preston v. M* Kinney, hereafter referred to. At this time, such objection was not thought of, where circumstances of fraud, &c. were relied on, and the party satisfies himself by answering to these objections.
Does the ease of Noland v. Cromwell sanction all these actings and reasonings ? Such an admission, I think, would go far to shake the authority of that case, I think it could not have been intended to go this far; and if it does, it may be remarked, that on this point, it was by a divided Court, two to two, so far as Judges were present in Court; and if it be taken two to three, it is admitted, that as to this matter of implied notice, arising from surveys of lands made at a different place from that called for by the entry, it was a new point, and did not exist in that case, though argued on by way of analogy; and if it did exist, could at most only be considered a single decision by a divided Court, on that point In Witherington v. M’Donald, 1 Hen. & Munf. 306, Judge Lvosrs says, “The law has never been deemed to be settled on one decision, where there has been nearly an equal division of the Court.” This is giving it all the authority to which any such decision is entitled.
But, several cases have been decided since, to say nothing of those before, which seem to me to settle this matter otherwise, and at any rate, to leave it as a matter open to enquiry and more solemn decision. Amongst these, the case of Preston v. Kinney, which was decided by Chancellor Brown of Staunton, in July, 1814, just after Noland v. Cromwell, and in this Court, in 1820, seems most like the present case. That case is not re *534 ported; and I may therefore be excused for slating if pretty much at length. It was this.
M’Kinney had the oldest entry, but Preston’s survey anc* patent were older than his. Douglass, under whom M’Kinney claimed, made his entry for 500 acres in 17&0, on a treasury warrant, which was surveyed on the 38th day of November, 1797, and was patented on the ——— day of —— by John Balfour, as assignee of the entry or plat; and he conveyed by deed to M’Kinney, in February, 1802, who brought this suit in March, 1802.
The bill further alleged, that in the year 1782, an entry was made, in- the name of James Dysart, for 300 acres, which was shortly afterwards surveyed, and interferes with the plaintiff’s land upwards of 200 acres. The objection that the surveyor, Preston, had used the name of Dysart, instead of malting his entry in the clerk’s office according to law, was insisted on, and was answered by saying, that it was made for the benefit of the son of the surveyor, &c. and to whom the patent issued. It seems that this survey was made about December, 1785, and that the patent issued about August, 1792.
Various objections are made to the claim and proceedings of the defendant, in order to show the superior equity of the complainant; and amongst others, that his entry, survey and patent, were entirely different land from that called for in the entry.
The answer admits, that the complainant’s entry is prior, but that the defendant has the oldest survey and patent; and also denies that the complainant’s entry covers the land in dispute. And in an answer to an amended bill, the defendant insists that the Court can give the complainant no relief, “ as he has not shewn why he could not enter a caveat,” he. After this, viz.; at July term 1811, the plaintiff has leave to amend his bill, in which he states, that he, and those under whom he claims, were prevented from entering a caveat against Preston’s grant, by the following circumstances: that Douglass, in whose favour the entry *535 was made, lived at a considerable distance from the land in controversy, had actually removed to Kentucky before Preston's survey was made, and neither knew of the interference, or of the necessity of a caveat, if he had; that Balfour, his assignee, lived also at, a considerable distance from the land; was never on it in his life, and did not know of the interfering claim, until after the patent issued; our did'the plaintii! know of it, until long after.
In 1813, Preston answers this bill; He says Douglass lived within five or six miles of the respondent at the time the survey was made, (the respondent was surveyor of the county] in December, 1783, on which a grant issued in August, 1793, He cannot say whether Douglass know of the interference of his claim, but if it did interfere, presumes it was his duty to acquire that information and arrest the title, and his negligence cannot operate in his favour. lie verily believes, that before his grant issued, Half oar understood and believed that his survey interfered with the entry, which in September, 1791, he purchased of Douglass} and thinks he had a conversation with him on the subject. He however thinks, that the -mere negligence of the party to enquire, will not be a ground of relief. It was his duty to perfect his title with all convenient, dispatch. There was no surprise, as six years elapsed between the making of his survey and patent; no fraud or concealment on his part; and the interference could easily have been discovered, and Douglass and Balfour resided but a few miles farther from the land than the defendant; that ignorance of law will not excuse; and he does not believe that any thing exists to take the ease out of iho general rule, which has been laid down as io the necessity of entering a caveat in such a case.
Much testimony w-t:; taken pro and con, os the various objections on both sides, made by the pleadings; and the counsel filed each a written argument.
In that filed by the complainant, the following observations wore in substance made, as io the point now under consideration.
*536 On the caveat question, we contend for the plaintiff, 1st, that we have a right to come into. Court for relief, because the defendant, Preston, gained his priority at law by bad faith. First, it is bad faith for a surveyor to enter and survey lands, under cover of another name, &tc.: that even if this was matter for a caveat, Courts of Equity have concurrent jurisdiction in all matters of fraud, &c. Secondly, it was bad faith in him, not to survey for the plaintiff in due time, but to survey the land entered by him for another, by a junior entry, and especially when it did not cover the land, &c.
II. We. could not enter a caveat, because we did not know of the interference. The answer does not deny this allegation. If it did, it will appear clearly that M’Kinney had no notice, until long after the patent issued. Had Balfour notice ? It appears the entry was transferred to him in 1791. The patent to Preston issued in 1792, upon a survey made in 1788. When Balfour purchased, no one was settled on the land. There was no clearing, except Hoover’s small improvement. The lines of Preston’s survey did not run near that place, &c. Balfour then had -no survey, and was never informed of the interference by oral communication. How then, was he to know it ? Suppose he had gone on the land, and looked for the lines. Could he have found them ? And if he had, would he have known whose lines they were ? Suppose he had gone to the surveyor’s office. Could the plat have informed him of the interference ? There is no probability that it would.Besides, he had no right to see the book of surveys, or to have a copy of the plat; and he might have searched the Register’s office in vain, &c. The plat does’not call for any lines or courses of the plaintiff’s land; nor for Hootier’s improvement. Had Douglass notice ? All the above observations apply to him.
The counsel for the defendant replies to this. 1st, He repels the argument of illegality, because the entry was *537 not made with the clerk, fkc. 2d, lie repels the charge of a failure of duty in not surveying, &e.
As to ignorance, the defendant denies the fact, and if it was so, the law will not warrant the inference drawn. As to the fact: It is proved that Balfour had notice of Preston’s claim, because he would not make a general warranty for that reason. There is no proof that this knowledge was imparted to him after Preston’s patent had issued; and it is incumbent on the plaintiff to prove their ignorance. But, it is denied that positive notice is necessary; implied notice is enough. When an entry is regularly made, embracing land which another has previously located, it is the duty of the first locator to take care that such second entry is not carried into grant. The entry book is Intended as a notice to all persons interested, and every person is to take notice at his peril. When the entry does not embrace the plaintiff’s land,, but a survey is made thereon, which does embrace it, the case is different. This was the principle on which the Court determined the case of Unerbarger v. Walton’s heirs. But, why shall the entry hook be notice to a posterior locator, who intends to commence a title, and not be notice to one who has made a location, until his title is perfected ? So that, abandoning the idea of a notice by the survey, he contends that the entry covered the land, and that a prior locator was bound to notice it.
The Chancellor, after disposing of the other points in the cause, says, “But there is a fifth ground of defence relied on, on which I am unable to form an opinion perfectly satisfactory to myself; viz: that the plaintiff has shejvn no good cause why a caveat was not issued. He swears that neither he, nor those under whom he claims, had any knowledge of the interference of the surveys. The defendant Preston, in his answer, swears, that he eannot say whether Douglass had any knowledge of the interference, but believes that Balfour knew of it, before the patent issued: that Balfour purchased of Douglass in *538 1791, and the patent issued in 1792; and thinks that he had a conversation with him on the subject; but when the supposed conversation was, he does not say; but he seems to rely principally on the implied notice, which every locator is presumed to have, by the entry, and contends very properly, that it is the duty of every one interested to seek for the'information necessary to protect his rights. There is evidence to shew, that both Balfour and the plaintiff had notice, at the time of the plaintiff’s purchase from Balfour, which was about the year 1797, (several years after the patent issued;) but there is no positive evidence to shew, when that knowledge by either was first acquired. Balfour is dead; and his answer cannot be had; and we cannot expect proof of a mere negative from the plaintiff, nor dismiss his bill for want of it; more especially as the charge is not expressly denied. But, the implied or presumptive notice afforded by an entry, and which every one has a right to inspect, must be considered sufficient notice to all interested, of the facts slated in that entry. Now, what are the entries here, and what notice is afforded by Dysart’s entry, of an interference with the entry of Douglass ?” He then goes into a comparison of the entries, to shew that they appear not to cover the same land, and could not interfere; which brings the case, in his opinion, within the principle laid down in this Court, in the case of Unerbarger v. Walton’s heirs. “ That case,” he says, S<is now before the Court of Appeals, not acted on, to hisv knowledge. Indeed, this case is stronger; for in that case, there was no caveat, nor any reasons assigned why one had not issued. But, the principle of implied notice is the same. On the whole, believing the justice of the case to be with the plaintiff, I must decree in his favour, leaving it with a more enlightened Court to correct any error which I may commit.” This decree was affirmed herein June, 1820. The case of Unerbarger v. Walton’s heirs never came here; and therefore, was acquiesced in by 'she parties. Indeed, it was admitted by the counsel, a *539 very able land lawyer, who argued this case below, that that ease was well decided. As to implied notice by a survey, as a matter of record, even if the parties have access to the book of surveys, I never could perceive its force. It does not, like an entry, give a succinct and general description of the land, the water-courses, adjoining lands, entries, &c. where it. is to begin, and in what direction to extend, &c.; but may begin at a tree in the forest, and run to another tree, &tc. without designating any notorious land-mark, or, as in this ease, even other surveys which it actually adjoins. As to its being notice as an act in pais, that will depend on whether the party, whose title it interferes with, was present, or whether the line ran near his improvements, or around them, so that the chain-carriers, and other disinterested persons present, could discover the interference, and give notice. But where an open line is left, as in this ca.se, and in that of Hughes v. Clung, how are they to know in what way the line is to be closed ?
Suppose survey No. 4, had not been made before survey No. 2. When the surveyor got to the point D, he might have protracted a line to If , a course of No. 5, and would then have had lines of other surveys, conducting him to his beginning, and it would have been a lawful survey, with only one open line in it. The surveyor himself does not know which of these surveys was made first; why even those various surveys, made about the same time perhaps, joining though not calling for each other, were so made, unless it was to keep the thing as private as possible. No opinion is given, so as to shew on what point this Court decided the case of Preston v. M’Kinney; and it may be said that it went off on the ground of improper conduct in the surveyor, in entering land in the name of another, for the benefit of his son, instead of making the entry in the clerk’s office. But I think this cannot well be supposed. The Chancellor did not decide on that ground. It was not an entry for the survey; (and he gave *540 a reason for that course, which was doubtless considered satisfactory;) but, on the one now under consideration, and on which he had decided another case, and appeals, as it were, to this Court, to say whether those decisions were correct. His Courts lay in a part of the State, to which these cases peculiarly belong; and in cases where the inferior Courts decree on particular grounds which are not thought here to be tenable, though the decree may be supported on other grounds, it is usual for us, (especially when the ground assumed is an important one in point of principle,) to say, that the decree is affirmed, but not for the reasons assigned by the Chancellor, &c. It is an undoubted fact, that the case of Noland v. Cromwell was not approved by that portion of the country peculiarly interested in the principles of that decision; and an attempt was made .in the Legislature to obviate its effects. There was good ground, therefore, for this Court to pause, and at all events, not to carry that case beyond the points really arising in it. The merits of that case, too, were with the decree.
If the Chancellor’s opinion, then, was approved of on this point, (as it seems to me it was,) it would be decisive of the case before us. But, if it went on the ground of improper conduct in the surveyor, either in making an improper entry as aforesaid, or in surveying lands not covered by the location, but in a different direction from it, and without giving notice to the party whose land he was surveying, which exists also in this case, (to say nothing of the other improprieties before noticed,) it seems to me that there is abundant ground in this case, to bring it within even that principle of decision. A public officer ought to stand indifferent, and do justice as far as depends on him. He had no authority by law to survey land, so entirely variant from the location, and might have refused to do so; at least so far as he was required to survey lands he had shortly surveyed for another, on a prior and regular entry. His duty, by law, was to be bounded by the lines of other surveys; and at all events, he was inexcusa *541 ble in not notifying that other. His deposition is taken in the cause; and he does not pretend to say, that he gave any such notice, or any reason for thus violating his duty.
Under all these considerations, I cannot yield my assent to carry the ease of Noland v. Cromwell any further than I am imperiously bound to do, and think that it does not, in any view of it, require that this decree should be reversed. The cases of Guerrant v. Bagby, 6 Munf. 160, Christian v. Christian, Ibid. 534, and Lyne v. Jackson, and The same v. Wilson, 1 Rand. 114, have also been since decided, and the case of Noland v. Cromwell, pressed on the Court, without effect.
The presumptive notice, in consequence of an actual survey on the land, I think cannot be maintained by the deposition of the surveyor. It is true, he says, that he ran the lines of flus 214 acre survey, except the last line. But, whether he ran the lines L. P. O. which are common to the two surveys of 214 and 338 acres, when he ran the 338 acre survey, or the other, he does not know; for, he does not know which of them he made first; and he did not fun them more than once. But, he ran the lines of Razor’s survey on to D. I believe he did, when he ran them for Razor; but, I think he is mistaken, if he intends to say so, that he ran them again, when he made the 214 acre survey. Had he done so, he would have found that he had not reached Ewing’s line, and of course, would not have called to run with it the last course. The surveys were made 38 years before his deposition was taken, and he had forgotten what happened. It was afterwards discovered, that they had not gone to Ewing’s line; and the 66 acre survey was made, so as to cover all Razor’s survey. When that survey was made, running probably near the improvements, the party gets notice, and files his caveat as to it, That survey was made in 178.9. But, a patent had issued In 1788 for the 214 and 338 acres. So that no caveat was, or could be filed as to them; the party, as we may well pre> sume, not having notice, or he would have caveated them as well as the 66 acre survey.
*542 As to the objection, taken on the trial, to the want of description of Razor’s warrant in his entry, I think there is nothing in it; and that it comes too late. If he deposited his warrant with the surveyor, (which we must presume,) all he had to do, was, to direct the location specially, so as to designate the lands intended; and if the surveyor failed to take due notice of the warrant, his neglect could not prejudice the party. But, if the surveyor holds the warrant, and duly notes it on his book of survey, from which, and. not from the book of entries, it is to be certified, it is enough to justify the patent. True, if there is any fraud or collusion with the surveyor in entering lands when no warrant is produced, so as to cover them until one is presumed, or withdrawing warrants once entered, and after-wards filing others, it is a fraud; which, if made out, ought to vitiate the proceedings. But, there is no such allegation here; and such misconduct^ in a public officer is not to be presumed. On the contrary, the warrant and all are returned, and a grant obtained.
There is no ground to say, that Razor’s entry and survey were void for these reasons. They were good, were originally preferable in law and equity to the pre-emption right of the company, at least from the moment they made their location in a different direction; and that equitable right remains unimpaired to this day, and ought to prevail. If my view of the facts is correct, (in which I think I cannot be mistaken,) it seems to me, there can be as little doubt of the law as of the justice of the ease.
I think, therefore, the decree ought to be affirmed.
Decree reversed.

 The President and Judge Cabell, absent.

 See the last ogside